IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| PATRICIA HAWKINS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 1:12-cv-00184 |
| | )   Senior Judge Haynes |
| | ) |
| MAURY COUNTY BOARD OF | ) |
| EDUCATION, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM**

Plaintiff, Patricia Hawkins, filed this action under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e et seq. ("Title VII"), against the Defendant, Maury County Board of Education

("MCBE"). Plaintiff's claims arise out of her involuntary transfer that she contends was

discriminatory based upon her race. Plaintiff also contends that Defendant harassed and retaliated

against her after she complained of discrimination.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 23),

contending that: (1) with respect to her discrimination claim, Plaintiff has not suffered an adverse

employment action and she was not treated less favorably than a similarly situated employee outside

of a protected class; (2) with respect to her retaliation claim, Plaintiff has not suffered an adverse

employment action and there is not any causal connection between any such action and Plaintiff's

engagement in protected activity; and (3) Plaintiff has not established that she was subjected to

unwelcome harassment. Plaintiff filed a response in opposition (Docket Entry No. 30), conceding

that she is not pursuing claims for harassment or hostile work environment, but contending that

genuine issues of material fact render summary judgment inappropriate with respect to her claims

for discrimination and retaliation. Defendant filed a reply (Docket Entry No. 33).

For the reasons stated herein, the Court concludes that genuine issues of material fact preclude summary judgment with respect to Plaintiff's discrimination and retaliation claims. Accordingly, Defendant's motion for summary judgment (Docket Entry No. 23) should be denied.

## A. Review of the Record[1]

In September 2001, Plaintiff, who is African-American, began working for the Maury County Board of Education ("MCBE") as a school counselor for Spring Hill School. (Docket Entry No. 31, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 1). After working in that position for approximately a year and a half, Plaintiff transferred to Culleoka School as a guidance counselor. Id. at ¶ 2. After two months at Culleoka School, Plaintiff transferred to Joseph Brown Elementary School ("JBES"), where she became a full-time guidance counselor in September 2002. Id. at ¶¶ 3-5. JBES is a MCBE school. Id. at ¶ 3. Plaintiff remained in her position at JBES until May 2010, when she was transferred to Highland Park Elementary School ("HPES"). Id. at ¶¶ 5, 28. As a tenured teacher, Plaintiff's job assignments are year-to-year. Id. at ¶ 26.

Edward "Eddie" Hickman has been the director of schools for MCBE since 2004. Id. at ¶ 6. Dr. Tina Weatherford has been employed by MCBE for 32 years and was appointed principal of JBES for the 2008-2009 school year. Id. at ¶¶ 7-8.

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are material factual disputes to preclude summary judgment on Plaintiff's discrimination and retaliation claims.

On June 17, 2009, Plaintiff wrote a letter to MCBE employees Jerry Wilson and Mary Carter expressing her concern over the lack of hiring and retaining minority employees within the Maury County School System and seeking an opportunity to meet and discuss her concerns. (Docket Entry No. 32-3, Exhibits to Hickman Deposition at 120). Hickman received Plaintiff's complaint from Carter and Wilson. (Docket Entry No. 31, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 13). Following a discussion with Carter, Wilson, and the MCBE attorney, Hickman scheduled a meeting with Plaintiff, Carter, Wilson, Weatherford, and other MCBE employees on July 13, 2009. Id. at ¶¶13-14. During this July 13, 2009 meeting, Plaintiff expressed her concerns over the hiring and retention of minority employees at MCBE schools and at JBES. Id. at ¶ 15. Plaintiff disputes that any type of investigation, solution, or resolution to the complaint was discussed at the July 13, 2009 meeting.

In response to Plaintiff's previous complaints, Hickman sent Plaintiff a letter dated August 11, 2009, that stated in relevant part:

> I would ask that you realize that Dr. Tina Weatherford is the principal and that she is my designee to lead the staff in educating the children that attend Joseph Brown Elementary School. One must realize that with every leadership change there will be changes in employees expectations. I would hope that you will find a way to become a team member and help Dr. Weatherford in this endeavor. If you choose that you cannot, then I would ask that you forward a letter to me asking for a transfer in the area(s) that you are endorsed and that I transfer you to the first available certified position.

(Docket Entry No. 32-2, Exhibits to Hawkins Deposition at 222).

Although Plaintiff never requested a transfer out of JBES, and Weatherford did not request that Plaintiff not return to JBES following the 2009-2010 school year, Hickman made the decision to transfer Plaintiff from JBES to HPES and transfer the guidance counselor from HPES to JBES.

3

Id. at ¶¶ 19, 25, 28. The guidance counselor transferred from HPES to JBES, Pam Riddle, is Caucasian. (Docket Entry No. 32-4, Deposition of Wanda Ward-Dunn at 4-7). Regarding the decision to transfer Plaintiff from JBES to HPES, Hickman testified that:

> Q: Okay. Tell me how you felt like this transfer would be for the efficient operation of the school system.
>
> A: I think it might settle things down. I thought Ms. Hawkins would be much happier. I think she would be much more effective, efficient, because she wasn't happy with who the principal selection was, or didn't – I did not feel professionally that she was giving her an opportunity to lead that school.
>
> Q: You didn't think Ms. Hawkins was giving Dr. Weatherford an opportunity?
>
> A: Right.
>
> Q: And you said – I think you said that you thought that Ms. Hawkins would be happier. What made you think that?
>
> A: I thought that things would be much better for her, as well as the other guidance counselor. You know, when things fester and they continue to fester, you try to do some things to try to get things to a happier level on both parties.
>
> Q: Are there more African-American teachers at Highland Park than there were at Joseph Brown; do you know?
>
> A: I couldn't tell you that.
>
> Q: Ms. Dunn is African-American, isn't she?
>
> A: That is true.
>
> Q: Did that play any role? Did you think that Ms. Hawkins would respond more positively to an African-American?
>
> A: Well, she was happy with Dr. Cornelius and –

Q:      I'm sorry. I guess I should have asked that a long time ago.
        Dr. Cornelius is African-American?

A:      Yes, he is.

Q:      So did you think that Ms. Hawkins might respond more
        positively to an African-American principal?

A:      Yes, I did.

Q:      Did that bear into your determination as to the fact that maybe
        Highland Park would be a good fit for her?

A:      I think it was because of the demographics were the same, just
        about even. The type of students that are at Highland Park are
        the type of students that are at Brown Elementary, so we felt
        like it would be a good fit.

. . .

Q:      And you thought that moving her to a school that had an
        African-American leader would be a positive move –

A:      Because I personally felt, professionally felt –   . . .
        Professionally and personally, and this is my professional
        opinion, I felt like she didn't want to work for Dr.
        Weatherford.

Q:      And you thought she might want to work for Ms. Dunn?

A:      Because she had worked for Dr. Cornelius, and that's where
        she was the most happiest. And as I stated before, she made
        me feel like she was demanding me to hire Dr. Cornelius
        back.

(Docket Entry No. 23-2, Deposition of Edward Allen Hickman at 37-42).

As to retaliatory conduct, when Weatherford noticed that pictures painted by Dr. Joe

Cornelius, the former principal at JBES, were missing from the school, Weatherford made an

announcement, or "all-call," to all JBES staff, at the instruction of Hickman, asking that the pictures

be returned. Id. ¶¶ 17-18. Yet, Plaintiff alleges that Weatherford and Hickman "singled the Plaintiff out" as it relates to the pictures. Id. at ¶ 18. Weatherford also asked Plaintiff to stand outside her classroom at the beginning of the school day at JBES because there was a need for someone to watch the children leaving the main building and going to the outside buildings. Id. at ¶ 22. Yet, Plaintiff alleges that she was the only "non-classroom" or "non-core" teacher who was forced to monitor the hall. Id. at ¶ 22. Although Plaintiff disputes that Weatherford ever filed a formal complaint, Weatherford informed Hickman that she felt she was being harassed by Plaintiff, who repeatedly and challenged and questioned instructions from Weatherford in front of others. Id. at ¶ 20.

During the 2012-2013 school year, Ward-Dunn, the HPES principal, moved Plaintiff to a different classroom because she needed to place a classroom teacher in Plaintiff's larger classroom. (Docket Entry No. 31, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 31). The guidance counselor previously had a smaller classroom. Id. Ward-Dunn ultimately moved four teachers, including Plaintiff, to different classrooms for the 2012-2013 school year. Id. at ¶ 32. The school principal decides assignments of teachers to different classrooms inside a MCBE school. Id. at ¶ 30.

Also during the 2012-2013 school year, Ward-Dunn made the decision to provide teachers with Promethean boards, starting with the classroom teachers first and, as funds became available, providing Promethean boards to other teachers. Id. at ¶ 35. Plaintiff did not receive a Promethean board at first, but she received one for the 2013-2014 school year. Id. at ¶ 34. Yet, Plaintiff alleges that she was the only teacher at HPES that did not receive a Promethean board prior to the 2013-2014 school year. Id.

When Plaintiff transferred to HPES from JBES, her salary, wages, and employment benefits

6

remained the same. Id. at ¶¶ 36-37. Plaintiff remains employed by MCBE as a counselor at HPES. Id. at ¶ 38.

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined

a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman, 873 F.2d at 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party

then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'")(quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . .
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive

9

evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through

10

and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). In this district, the parties must

provide specific references to the proof upon which they rely. See Local Rule 56.01(c) requiring each

party to provide a statement of undisputed facts to which the opposing party must respond.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

other authorities on summary judgment and synthesized ten rules in the "new era" on summary

judgment motions:

> 1.      Complex cases are not necessarily inappropriate for summary judgment.
>
> 2.      Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3.      The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.
>
> 4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed

upon a motion for summary judgment: (1) has the moving party "clearly and convincingly"

established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to

establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the

12

nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## 1. Discrimination Claims

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a discrimination claim under Title VII by direct or circumstantial evidence. DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004).

### a. Direct Evidence

Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the adverse employment action." Erwin v. Potter, 79 Fed. App'x 893, 896 (6th Cir. 2003) (internal citation omitted). Thus, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 915 (6th Cir. 2013) (quoting Thompson v. City of Lansing, 410 Fed. App'x 922, 929 (6th Cir. 2011)). If the plaintiff presents direct evidence that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have taken the adverse action, even if it had not been motivated by impermissible discrimination. Bryant v. Rolling Hills Hosp., LLC, 836 F. Supp.2d 591, 606 (M.D. Tenn. 2011) (citing Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)). "Evidence of discrimination

13

is not considered direct evidence unless a racial motivation is explicitly expressed." Amini v. Oberlin

College, 440 F.3d 350, 359 (6th Cir. 2006). "[A]lthough direct evidence generally cannot be based

on isolated and ambiguous remarks, when made by an individual with decision-making authority,

such remarks become relevant in determining whether there is enough evidence to establish

discrimination." DiCarlo, 358 F.3d at 416.

Here, Plaintiff submits the Hickman deposition testimony as direct evidence of retaliation.

Regarding the decision to transfer Plaintiff to HPES from JBES, Hickman testified that:

> Q: Okay. Tell me how you felt like this transfer would be for the efficient operation of the school system.
>
> A: I think it might settle things down. I thought Ms. Hawkins would be much happier. I think she would be much more effective, efficient, because she wasn't happy with who the principal selection was, or didn't – I did not feel professionally that she was giving her an opportunity to lead that school.
>
> Q: You didn't think Ms. Hawkins was giving Dr. Weatherford an opportunity?
>
> A: Right.
>
> Q: And you said – I think you said that you thought that Ms. Hawkins would be happier. What made you think that?
>
> A: I thought that things would be much better for her, as well as the other guidance counselor. You know, when things fester and they continue to fester, you try to do some things to try to get things to a happier level on both parties.
>
> Q: Are there more African-American teachers at Highland Park than there were at Joseph Brown; do you know?
>
> A: I couldn't tell you that.
>
> Q: Ms. Dunn is African-American, isn't she?

14

A:   That is true.

Q:   Did that play any role? Did you think that Ms. Hawkins would respond more positively to an African-American?

A:   Well, she was happy with Dr. Cornelius and –

Q:   I'm sorry. I guess I should have asked that a long time ago. Dr. Cornelius is African-American?

A:   Yes, he is.

Q:   So did you think that Ms. Hawkins might respond more positively to an African-American principal?

A:   Yes, I did.

Q:   Did that bear into your determination as to the fact that maybe Highland Park would be a good fit for her?

A:   I think it was because of the demographics were the same, just about even. The type of students that are at Highland Park are the type of students that are at Brown Elementary, so we felt like it would be a good fit.

. . .

Q:   And you thought that moving her to a school that had an African-American leader would be a positive move –

A:   Because I personally felt, professionally felt –   . . . Professionally and personally, and this is my professional opinion, I felt like she didn't want to work for Dr. Weatherford.

Q:   And you thought she might want to work for Ms. Dunn?

A:   Because she had worked for Dr. Cornelius, and that's where she was the most happiest. And as I stated before, she made me feel like she was demanding me to hire Dr. Cornelius back.

15

(Docket Entry No. 23-2, Deposition of Edward Allen Hickman at 37-42).

The Court concludes that Hickman's statements constitute direct evidence of discrimination. Hickman explicitly testified that he thought Plaintiff might respond more positively to an African-American principal. Moreover, Hickman was the sole decision-maker in Plaintiff's transfer to HPES. See Docket Entry No. 31, Plaintiff's Response to Statement of Undisputed Facts at ¶ 28. Thus, the Court concludes that a jury could find that unlawful discrimination was at least a motivating factor in the adverse employment action.

As to whether Defendant would have made the same decision regardless of Hickman's discriminatory motive, Defendant contends that the decision to transfer Plaintiff was done for the purpose of avoiding future conflict with Weatherford. Yet, given Hickman's testimony that he thought Plaintiff might respond more positively to an African-American principal, the issue presents a triable question of fact. Accordingly, the Court will permit Plaintiff to present a direct evidence theory of discrimination at trial.

### b. Circumstantial Evidence [2]

Where a plaintiff seeks to establish discrimination through circumstantial evidence, courts apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Thus, Plaintiff must first establish a prima facie case of racial discrimination by showing that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was

---

[2]"The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." Kline v. Tennessee Valley Authority, 128 F.3d 337, 348-49 (6th Cir. 1997). Here, the Court concludes that Plaintiff can produce direct evidence of discrimination. Yet, even if the Court were to determine that Plaintiff cannot proceed under a direct evidence theory, the Court concludes that Plaintiff has sufficiently met her burden under McDonnell Douglas to preclude summary judgment under a circumstantial evidence theory.

qualified for the position; and (4) a person outside of her protected class replaced her or she was treated differently than similarly situated members of the unprotected class. Michael v. Caterpillar Financial Services Corp., 496 F.3d 584, 593 (6th Cir. 2007).

If Plaintiff makes out her prima facie case, then "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." Clay v. United Parcel Serv., 501 F.3d 695, 703-04 (6th Cir. 2007). If Defendant meets this burden, then "the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual." Id.

Here, Defendant concedes that Plaintiff has satisfied the first and third elements of the prima facie case, that she is a member of a protected class and that she is qualified for her position. Yet, Defendant contends that Plaintiff has failed to prove that she suffered an adverse employment action.

The Sixth Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of a plaintiff's employment." White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 795 (6th Cir. 2004) aff'd sub nom. Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). "A mere inconvenience or an alteration of job responsibilities is not enough to constitute an adverse employment action." Deleon v. Kalamazoo County Road Comm'n, 739 F.3d 914, 918 (6th Cir. 2014) (citing White, 364 F.3d at 797). Rather, "[a] 'materially adverse' change in the terms or conditions of employment is typically characterized 'by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Momah v. Dominguez, 239 Fed. App'x 114, 123 (6th Cir. 2007) (quoting Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999)). Thus, "a purely lateral transfer . . . which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination

purposes." Id. (citing Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996)).

The Supreme Court has held that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case," and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Deleon, 739 F.3d at 919 (quoting Burlington Northern, 548 U.S. at 71). As such, the Sixth Circuit has held that "a transfer may classify as an adverse employment action where it constitutes a 'constructive discharge.'" Id. (citing Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002)). In order for an employee to be constructively discharged, the working conditions "must be objectively intolerable to a reasonable person." Policastro, 297 F.3d at 539 (citing Kocsis, 97 F.3d at 886).

Yet, the Sixth Circuit "has not foreclosed the possibility that a transfer not rising to the level of a constructive discharge might nonetheless constitute a tangible employment action." Deleon, 739 F.3d at 919 (citing Keeton v. Flying J, Inc., 429 F.3d 259, 265 (6th Cir. 2005); Hollins, 188 F.3d at 662). "In those cases, the focus narrows to whether there are "other indices that might be unique to the particular situation which could turn what would ordinarily not be an adverse employment action into one." Id. (quoting Hollins, 188 F.3d at 662). The plaintiff must be able to show "a quantitative or qualitative change in the terms of the conditions of employment." Id. (citing Patt v. Family Health Sys., Inc., 280 F.3d 749, 753 (7th Cir. 2002)).

Thus, "an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." Id. Importantly, however, "[a]n employee's subjective impressions as to the desirability of one position over another are not relevant" for purposes of determining whether the employee was subjected to adverse employment action within the meaning

of Title VII. See Blackburn v. Shelby County, 770 F. Supp.2d 896, 923 (W.D. Tenn. 2011) (quoting Policastro, 297 F.3d at 539). Moreover, "[t]ransfers intended to respond to and resolve an employee's problems with another employee do not constitute adverse employment action within the meaning of Title VII." Id.

Here, Plaintiff contends that her involuntary transfer to HPES from JBES constitutes an adverse employment action. It is undisputed that, when Plaintiff transferred to HPES from JBES, her salary, wages, and employment benefits remained the same. (Docket Entry No. 31, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶¶ 36-37). In addition, Plaintiff maintained the title of "counselor" at HPES, where she is still employed in that position. Id. at ¶¶ 5, 38. Yet, Plaintiff contends that her transfer to HPES constitutes an adverse employment action because, in the education context, there is a negative stigma associated with the involuntary transfer of a teacher. Plaintiff relies upon her own affidavit to establish that teachers, generally, "never want to be the subject of an involuntary transfer. There is a stigma that is associated with such an involuntary transfer. A teacher is regarded by her colleagues and principals as a trouble-maker or as a bad or sub-par teacher." (Docket Entry No. 32-1, Affidavit of Patricia Hawkins at ¶ 16).

For this general assertion, that an involuntary transfer of a school teacher carries with it a professional stigma, Plaintiff cites Leary v. Daeschner, 228 F.3d 729 (6th Cir. 2000). In Leary, the Sixth Circuit concluded that "there is sufficient reasons to believe, based on the record evidence adduced by the plaintiffs, that an involuntary transfer carries with it significant costs for the transferee, including stigma, loss of professional esteem, and the difficulty of rebuilding relationships and professional status within the new school." Id. at 743.

To be sure, the Leary Court made this determination in the context of the plaintiffs' due

process claim. Thus, this Court does not interpret <u>Leary</u> to stand for the proposition that the involuntary transfer of a teacher to a new school necessarily carries a professional stigma sufficient to constitute a materially adverse employment action under the framework of Title VII analysis. Yet, <u>Leary</u> at least acknowledges that a plaintiff may be able to submit sufficient evidence to establish that an involuntary transfer carries with it a stigma or loss of professional esteem for school teachers.

As to the specific effects that the involuntary transfer at issue in this action actually had on Plaintiff, herself, she testifies that:

> I was forced to work extra hard to overcome the negative stigma that is associated with an involuntary transfer. To this day, I still feel like I am having to work extra hard at Highland Park to prove myself. Because of my involuntary transfer, I was forced to leave the students and families that had been a part of my professional life at JBES for a number of years. I was forced to create new professional relationships with the teachers and staff at Highland Park after being forced to leave behind professional relationships with colleagues that had been forged over a number of years at JBES. I was forced to answer questions within the community regarding why I was no longer at JBES. I worked harder at Highland Park in an effort to prove myself to Principal Dunn. I was embarrassed by my involuntary transfer and I was under a lot of stress as I adjusted to Highland Park. I spent numerous days over the summer relocating my belongings from JBES to Highland Park, without pay. I did all of this while I was supposed to be on "light duty" per my doctor. My back gave me problems during this time. I also spent several hundred dollars out of my own pocket to purchase school supplies and instructional material that I left at JBES. This whole ordeal has caused me significant stress and a spike in my blood pressure.

(Docket Entry No. 32-1, Affidavit of Patricia Hawkins at ¶ 16).

The Court concludes that, when viewing the evidence in a light most favorable to the Plaintiff, Plaintiff's affidavit, as well as the alleged retaliatory conduct she experienced, creates a genuine issue of material fact as to whether Plaintiff's involuntary transfer to HPES carried with it

a professional stigma, unique to the particular circumstances of this action, sufficient to constitute a qualitative change in the conditions of employment, rendering the involuntary transfer objectively intolerable to a reasonable person. As such, the Court concludes that Plaintiff has created a genuine issue of material fact as to whether her involuntary transfer constitutes a materially adverse employment action.

Finally, regarding the fourth prong of the prima facie case, Pam Riddle, who is Caucasian, ultimately replaced Plaintiff as the guidance counselor at JBES. (Docket Entry No. 32-4, Deposition of Wanda Ward-Dunn at 4-7). Thus, Plaintiff can establish a prima facie case of discrimination, shifting the burden to Defendant to articulate a legitimate non-discriminatory reason for the employment decision.

Here, Defendant contends that the decision to transfer Plaintiff was done for the purpose of avoiding further conflict between Plaintiff and her supervisor, Weatherford. Yet, given Hickman's testimony that he based his decision, at least in part, on the belief that Plaintiff might respond more positively to an African-American principal, the Court concludes that Plaintiff has created a genuine issue of material fact as to whether Defendant's proffered legitimate, non-discriminatory reason for the employment decision is pretextual.

Accordingly, Defendant's motion for summary judgment should be denied with respect to Plaintiff's discrimination claim under Title VII.

### 2. Retaliation Claim

Title VII makes it "unlawful . . . for an employer to discriminate against any . . employe[e] . . . because she has opposed any practice made . . . unlawful . . . by this subchapter." 42 U.S.C. § 2000e-3(a). "This opposition clause protects not only the filing of formal discrimination charges with

21

the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (internal citations omitted). As with a Title VII discrimination claim, a plaintiff may prove a retaliation claim under Title VII by direct or circumstantial evidence. See Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531 (6th Cir. 2008).

### a. Direct Evidence

In the context of a retaliation claim under Title VII, direct evidence is evidence that, "if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." Id. at 543-44. Thus, direct evidence "requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003) (emphasis in original).

Here, Plaintiff submits the Hickman deposition testimony, discussed supra, as well as an August 9, 2011 letter from Hickman to Plaintiff, as direct evidence of retaliation. That letter, sent in response to Plaintiff's previous complaints, states in relevant part:

> I would ask that you realize that Dr. Tina Weatherford is the principal and that she is my designee to lead the staff in educating the children that attend Joseph Brown Elementary School. One must realize that with every leadership change there will be changes in employees expectations. I would hope that you will find a way to become a team member and help Dr. Weatherford in this endeavor. If you choose that you cannot, then I would ask that you forward a letter to me asking for a transfer in the area(s) that you are endorsed and that I transfer you to the first available certified position.

(Docket Entry No. 32-2, Exhibits to Hawkins Deposition at 222).

The Court concludes that the statements in the Hickman deposition testimony and the August 11, 2009 letter to Plaintiff do not require the conclusion that unlawful retaliation was a motivating

factor in the employer's actions. Instead, inferences are needed to conclude that Plaintiff has been unlawfully retaliated against. As such, Plaintiff cannot prevail unless she presents circumstantial evidence of unlawful retaliation.

## b. Circumstantial Evidence

When a plaintiff seeks to establish a retaliation claim through circumstantial evidence, courts apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), discussed supra. Thus, Plaintiff must first establish a prima facie case of retaliation. If Plaintiff succeeds, then the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. If Defendant satisfies its burden of production, then the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reasons is not the true reason for the employment decision. Laster, 746 F.3d at 730. "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." Id. (citing Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007)).

To make a prima facie showing of retaliation under Title VII, Plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. Id. (citing Jones v. Johanns, 264 Fed. App'x 463, 466 (6th Cir. 2007)).

Defendant, again, concedes the first two elements of the prima facie case, that Plaintiff engaged in protected activity by filing her complaints and that Defendant was aware of the protected activity. Yet, the parties dispute whether Defendant took any materially adverse actions against Plaintiff and whether there was a causal connection between such action and a protected activity.

23

Importantly, "Plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." Id. at 731 (citing Burlington Northern, 548 U.S. at 67-71). "In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace." Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008). Thus, to meet the third element of a prima facie retaliation claim under Title VII, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Laster, 746 F.3d at 731 (quoting Burlington Northern, 548 U.S. at 68). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." Id. at 731-32 (quoting Michael v. Caterpillar Financial Services Corp., 496 F.3d 584, 596 (6th Cir. 2007)).

Here, Plaintiff cites her involuntary transfer as well as the August 11, 2009 letter from Hickman (Docket Entry No. 32-2, Exhibits to Hawkins Deposition at 222) as evidence of acts of retaliation following her complaint. In addition, Plaintiff also contends that Weatherford assigned Plaintiff extra duties, such as monitoring the halls before school, cleaning lunch tables, denying her continuing education training, ignoring light duty work restrictions, and assigning Plaintiff a classroom in a back building. (Docket Entry No. 32-2, Deposition of Patricia Hawkins at 40-41, 59, 161-164). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that these actions could certainly deter a reasonable employee from exercising her rights under Title VII. Thus, Plaintiff has presented sufficient proof and raised a genuine issue of fact as to whether she was

subject to materially adverse action.

Regarding the final element of a _prima facie_ retaliation claim, the Court concludes that the August 11, 2009 letter from Hickman to Plaintiff (Docket Entry No. 32-2, Exhibits to Hawkins Deposition at 222), stating that if Plaintiff cannot find a way to become a team member and help Weatherford then she should forward a letter to Hickman asking for a transfer, creates a genuine issue of material fact as to whether a causal connection exists between the protected activity and the materially adverse action.

Thus, the Court concludes that Plaintiff has successfully met her burden of production at the summary judgment stage to establish a _prima facie_ retaliation claim under Title VII. As such, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory justification for its actions.

Here, Defendant relies upon the explanation provided by Hickman for the rationale and basis of transferring Plaintiff to HPES. Yet, even if the Court were to accept Hickman's explanation as a legitimate nondiscriminatory justification for Defendant's actions, the August 11, 2009 letter presents sufficient evidence to "infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason" for the challenged action. Tingle v. Arbors at Hilliard, 692 F.3d 523, 531 (6th Cir. 2012).

Accordingly, the Court concludes that Plaintiff has satisfied her burden to show pretext at the summary judgment stage, and Defendant's motion should be denied with respect to Plaintiff's retaliation claims under Title VII.

### 3. Harassment and Hostile Work Environment Claims

In her response to Defendant's motion for summary judgment, Plaintiff concedes that she is not pursuing claims for harassment or hostile work environment. See Docket Entry No. 30,

Plaintiff's Response to Defendant's Motion for Summary Judgment at 25, n.17. Thus, the Court concludes that Defendant's motion should be granted with respect to Plaintiff's harassment and hostile work environment claims under Title VII.

## C. Conclusion

Accordingly, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 23) should be granted with respect to Plaintiff's harassment and hostile work environment claims and denied with respect to Plaintiff's discrimination and retaliation claims.

An appropriate Order is filed herewith.

**ENTERED** this the _27th_ day of July, 2015.

WILLIAM J. HAYNES, JR.,
Senior United States District Judge